## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

                                             Case No.  07-32016

WEBB MTN, LLC

                     Debtor

         WEBB MTN, LLC

                     Plaintiff

             v.                                Adv. Proc. No.  08-3070

EXECUTIVE REALTY PARTNERSHIP, L.P.,
GERALD FRANKLIN, TRUSTEE,
GREENBRIER DEVELOPERS, LLC,
M&A ENTERPRISES, INC., and
KENNETH WHALEY

                     Defendants

## M E M O R A N D U M

**APPEARANCES:**    GENTRY, TIPTON & McLEMORE, P.C.
                          Maurice K. Guinn, Esq.
                          W. Morris Kizer, Esq.
                          Post Office Box 1990
                          Knoxville, Tennessee 37901
                          Attorneys for Plaintiff

                      HODGES, DOUGHTY & CARSON.
                          Thomas H. Dickenson, Esq.
                          Oliver D. Adams, Esq.
                          Post Office Box 869
                          Knoxville, Tennessee  37901-0869
                          Attorneys for Defendants

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint filed by the Plaintiff on May 27, 2008, as amended by the Amended Complaint filed on July 31, 2008, seeking to nullify and/or set aside four quit claim deeds transferring real property from the Plaintiff to the Defendants. Following entry of an Order on February 11, 2009, dismissing ten (10) of the thirteen (13) counts of the Amended Complaint and the corresponding Memorandum on Motion to Dismiss Adversary Proceeding, Motion of Webb Mtn, LLC for Summary Judgment, Defendants' Cross Motion for Summary Judgment, and Motion to Strike Portions of Affidavit of Kenneth Whaley, the Defendants filed the Answer of Defendants to Amended Complaint on March 3, 2009. Pursuant to the Amendment to Pretrial Order entered on September 22, 2009, the Plaintiff now seeks to avoid only the transfer between the Plaintiff and the Defendant, Gerald Franklin, Trustee. An Order dismissing two of the three remaining counts in their entirety, with prejudice, was entered by agreement after the trial on October 6, 2009, while the third remaining count was dismissed, with prejudice, with respect to all of the transfers except the transfer to the Defendant, Gerald Franklin, Trustee.

The trial was held on September 28, 2009. The record before the court consists of Stipulations of Facts and Documents Related to September 28 Trial (Joint Stipulations) filed on September 18, 2009, twenty-eight exhibits introduced into evidence, the testimony of two certified real estate appraisers, Robert Jeffrey Fletcher and Donald White, and the testimony of four additional witnesses, Jack Collier, William P. Evans, Gerald Franklin, and Kenneth Whaley. During the course of the trial and at the close of the Plaintiff's proof, the Defendants made an oral motion to strike the testimony of the Plaintiff's appraiser, Mr. Fletcher, which, for reasons hereinafter discussed, will be denied.

This is a core proceeding.  28 U.S.C. § 157(b)(2)(A), (H), and (O) (2006).

**I**

The Plaintiff is a Tennessee limited liability company, whose sole member is Jack Collier. JT. STIPS. at ¶ 2.  On October 5, 2005, Mr. Collier entered into a First Agreement for Purchase and Sale with the Defendants for the purchase of approximately 1,865.60 acres comprised of several tracts having different owners, the Defendants, known as Webb Mountain, State Route 416, Pittmann Center Road, Sevierville, Sevier County, Tennessee (Webb Mountain Property). JT. STIPS. at ¶ 1.  The October 2005 contract was amended by Amendments to First Agreement for Purchase and Sale, Second Amendment to First Agreement for Purchase and Sale and Third Amendment to First Agreement for Purchase and Sale (collectively, Purchase Contracts) dated December 23, 2005, January 26, 2006, and March 10, 2006, respectively.  JT. STIPS. at ¶ 1; COLL. TRIAL. EX. 1.  Mr. Collier subsequently assigned the Purchase Contracts to the Plaintiff, and it purchased the Webb Mountain Property from the Defendants on March 24, 2006, for a total consideration of $27,975,000.00 through the execution and recordation of six General Warranty Deeds, with the final General Warranty Deed being a "catch all" based upon the survey of the entire Webb Mountain Property less the acreage conveyed by the Defendant, M&A Enterprises, Inc. JT. STIPS. at ¶ 3; COLL. TRIAL EX. 2.[1]

The Plaintiff paid $1,750,000.00 at closing and the remaining $26,225,000.00 was financed through five non-recourse Promissory Notes executed on March 24, 2006.  JT. STIPS. at ¶ 4.  Each

---

[1] *See infra* n.3.

Promissory Note had a maturity date of January 3, 2007, and each was secured by a corresponding

Deed of Trust as follows:  (1) Promissory Note to Kenneth Whaley, Greenbrier Developers, LLC,

M&A Enterprises, Inc., and Gerald Franklin, Trustee, in the amount of $4,790,000.00, secured by

the Whaley Tract, consisting of approximately 71 acres; (2) Promissory Note to Executive Realty

Partnership, L.P. in the amount of $990,000.00, secured by the Executive Realty Tract consisting of

approximately 21 acres; (3)  Promissory Note to Greenbrier Developers, LLC in the amount of

$10,465,000.00, secured by the Greenbrier Tract consisting of 195.89 acres; (4) Promissory Note to

Gerald Franklin, Trustee, in the amount of $8,980,000.00, secured by the Franklin Tract consisting

of approximately 1,445 acres;[2] and (5) Promissory Note to M&A Enterprises, Inc. in the amount of

$1,000,000.00, secured by the M&A Tract consisting of approximately 131 acres (collectively,

Promissory Notes).[3]  JT. STIPS. at ¶ 4; TRIAL. EXS. 3-7.

On June 23, 2006, the Plaintiff made the following payments totaling $3,250,000.00 to be

applied to the corresponding Promissory Notes: (1) $50,000.00 to Executive Realty Partnership; (2)

$1,000,000.00 to M&A Enterprises, Inc.; (3) $1,000.000.00 to Gerald Franklin, Trustee; (4)

$200,000.00 to Kenneth Whaley, Greenbrier Developers, LLC, M&A Enterprises, Inc., and Gerald

Franklin, Trustee; and (5) $1,000,000.00 to Greenbrier Developers, LLC.  JT. STIPS. at ¶ 5.  On

December 8, 2006, the Plaintiff paid the balance of approximately $12,000.00 owed to M&A

---

[2] *See infra* n.13.

[3] Although the Plaintiff purchased the Webb Mountain Property as a whole, the Defendants, as required by
Tennessee Code Annotated § 67-4-409(a)(6)(A) allocated the purchase price among the five tracts for purposes of paying
the required recordation tax.  Accordingly, when the General Warranty Deeds were recorded on March 28, 2006, each
contained the following certification: "I hereby swear or affirm that the actual consideration or value of the transfer,
whichever is greater, is _____."  The value assigned the respective tracts were as follows: Franklin Tract - $9,200,000.00;
M&A Tract - $2,500,000.00; Greenbrier Tract - $10,475,000.00; Whaley Tract - $4,800,000.00; and Executive Realty
Tract - $1,000,000.00.  COLL. TRIAL EX. 2.

4

Enterprises, Inc. on its Promissory Note, and the Deed of Trust encumbering the 131 acre tract was released. JT. STIPS. at ¶ 5. The amounts due under the remaining Promissory Notes were not paid by January 3, 2007, and the Defendants, through the trustee appointed under the deeds of trust, initiated foreclosure proceedings against the Webb Mountain Property. JT. STIPS. at ¶ 7.

On March 27, 2007, the parties entered into a Conditional Extension of Borrowers' Obligations Under Promissory Note (Conditional Extension Agreement) and an Escrow Agreement, as contemplated by the Conditional Extension Agreement, under the terms of which the scheduled foreclosures were adjourned to a date to occur after June 25, 2007, so long as the Plaintiff executed four quit claim deeds conveying to the respective Defendants the tracts of property securing the outstanding Promissory Notes (collectively, Quit Claim Deeds). JT. STIPS. at ¶ 8; TRIAL EXS. 9-11. The Quit Claim Deeds were delivered to Patrick Harrell, as escrow agent, and held in a safety deposit box at Smart Bank pursuant to the Escrow Agreement. JT. STIPS. at ¶ 8. Additionally, an interest payment of $421,679.23 required by the Conditional Extension Agreement was made on March 28, 2007. JT. STIPS. at ¶ 5.

The Plaintiff filed the Voluntary Petition commencing its case under Chapter 11 of the Bankruptcy Code on June 25, 2007. Following an evidentiary hearing held on September 11, 2007, the court granted the Motion to Dismiss Bankruptcy Case filed on August 10, 2007, by the Defendants, and the case was dismissed on September 17, 2007. JT. STIPS. at ¶ 10. No stay pending appeal was in effect subsequent to the entry of the dismissal Order, and the Escrow Agent, Patrick Harrell, thereafter released the Quit Claim Deeds from escrow, and they were recorded with the Sevier County Register of Deeds on September 18, 2007. JT. STIPS. at ¶ 10; COLL. TRIAL EX. 14.

The Plaintiff appealed the court's dismissal Order on October 29, 2007, and that Order was subsequently reversed by the United States District Court on February 8, 2008. JT. STIPS. at ¶ 10. Following reinstatement of the bankruptcy case, the court, on March 6, 2008, entered an Order granting the Defendants' Motion for Entry of Order Determining That Debtor is Subject to the "Single Asset Real Estate" Provisions of 11 U.S.C. § 362(d)(3) filed on August 1, 2007, which was affirmed on appeal by the United States District Court on August 26, 2008. JT. STIPS. at ¶ 11; TRIAL EX. 15.

The Plaintiff filed the five (5) count Complaint initiating this adversary proceeding on May 27, 2008, which it amended on July 31, 2008, with a thirteen (13) count Amended Complaint. On July 8, 2008, the Defendants filed the Motion to Dismiss Webb Mtn, LLC's Adversary Proceeding for Failure to State a Claim Upon Which Relief Can Be Granted and Failure to Plead Fraud With Particularity, which they amended on August 11, 2008. Thereafter, the Plaintiff filed the Motion of Webb Mtn, LLC for Summary Judgment on September 2, 2008, to which the Defendants filed the Response to Webb Mtn, LLC's Motion for Summary Judgment and Defendants' Cross Motion for Summary Judgment on September 22, 2008. The court, by an Order entered on February 11, 2009, supported by a comprehensive Memorandum Opinion, dismissed Counts I through X of the Amended Complaint, leaving only Counts XI, XII, and XIII pending. *See Webb Mtn, LLC v. Exec. Realty P'ship, L.P. (In re Webb Mtn, LLC)*, 414 B.R. 308 (Bankr. E.D. Tenn. 2009). The Defendants filed their Answer on March 3, 2009, along with the Motion by Defendants for Judgment on the Pleadings as to Counts XII and XIII of the Amended Complaint, arguing that 11 U.S.C. § 544 only applies to pre-petition transfers. In a decision rendered from the bench on

6

April 9, 2009, and memorialized in an Order entered that same date, the court denied this motion.

*See  Webb Mtn, LLC v. Exec. Realty P'ship, L.P. (In re Webb Mtn, LLC)*, 2009 WL 1117469, 2009

Bankr. LEXIS 1128 (Bankr. E.D. Tenn. Apr. 9, 2009).[4]

The court entered a Pretrial Order on May 18, 2009, setting forth the remaining issues before

the court; however, as stipulated by the parties in the Amendment to Pretrial Order entered on

September 22, 2009, the Plaintiff now only seeks to avoid the transfer of the 1,445 acre tract

effectuated by the recordation of the Franklin Quit Claim Deed on September 18, 2007.    On

October 6, 2009, the court entered an agreed Order dismissing with prejudice Counts XI and XII in

their entirety and Count XIII with respect to all tracts other than the Franklin Tract.    The effect of

this Order was to dismiss all Defendants except Gerald Franklin, Trustee.

The remaining issues before the court are:

(1) whether the post-petition transfer to Gerald Franklin, Trustee, is avoidable under

11 U.S.C. § 544(b) (2006);

(2) if so, whether the release from escrow and/or the recording of the Franklin Quit

Claim Deed regarding the 1,445 acre Franklin Tract on September 18, 2007, is avoidable by

the Plaintiff pursuant to Tennessee Code Annotated § 66-3-305 (2004) and/or Tennessee

Code Annotated § 66-3-306(a) (2004) by virtue of 11 U.S.C. § 544(b) because the Plaintiff

received less than reasonably equivalent value in exchange for the Franklin Quit Claim Deed

---

[4]  The hearing on the Defendants' Motion for Judgment on the Pleadings was held on April 9, 2009, after which
the court rendered its decision from the bench and issued the Order denying the motion.  At the request of the parties,
the oral opinion was transcribed by the court reporter and filed on April 21, 2009.  Westlaw and Lexis have cited to the
later date.

and the Plaintiff either became insolvent as a result of the transfer effectuated by the recordation of the Franklin Quit Claim Deed or the transfer effectuated by the Franklin Quit Claim Deed left the Plaintiff with remaining assets unreasonably small in relation to the business or transaction in which it was about to engage; and

(3) if the transfer is avoidable, whether the Defendant, Gerald Franklin, Trustee, is the immediate transferee of an initial transferee (the escrow agent), and if so, whether he took for value, in good faith, and without knowledge of the voidability of the transfer the Plaintiff seeks to avoid, and whether this Defendant is entitled to the protections afforded by 11 U.S.C. § 550(e)(1) (2006).

As to the question of the valuation of the Franklin Tract, the parties introduced into evidence the testimony of two expert real estate appraisers:  Robert J. Fletcher by the Plaintiff and Donald White by the Defendants.  During the trial and the close of the Plaintiff's proof, the Defendants made an oral motion that the testimony of Mr. Fletcher concerning the alleged fair market value of the Franklin Tract be stricken, or, in the alternative, be given no evidentiary weight, on the grounds that he did not actually appraise the property but used a mathematical formula to "back into" the valuation.  The Defendants contend that this methodology is not in compliance with the Uniform Standards of Professional Appraisal Practice, notably Rule 1-4, and, therefore, Mr. Fletcher's testimony was not competent under *Wray v. Knoxville, L.F. & J.R. Co.*, 82 S.W. 471 (Tenn. 1904). The court reserved decision on the motion, and at its direction, the parties filed briefs in support of their respective positions on October 5, 2009.  Because the question of Mr. Fletcher's testimony is

material to the issue of whether the Plaintiff received reasonably equivalent value, the court must

address it before addressing those issues set forth in the Amended Pretrial Order.

## II

Expert testimony is governed by Rules 702 and 703 of the Federal Rules of Evidence, which

provide as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
> or data, (2) the testimony is the product of reliable principles and methods, and (3)
> the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

> The facts or data in the particular case upon which an expert bases an opinion or
> inference may be those perceived by or made known to the expert at or before the
> hearing.  If of a type reasonably relied upon by experts in the particular field in
> forming opinions or inferences upon the subject, the facts or data need not be
> admissible in evidence in order for the opinion or inference to be admitted.  Facts or
> data that are otherwise inadmissible shall not be disclosed to the jury by the
> proponent of the opinion or inference unless the court determines that their probative
> value in assisting the jury to evaluate the expert's opinion substantially outweighs
> their prejudicial effect.

FED. R. EVID. 703.  Courts have broad discretion to admit the testimony of expert witnesses and in

the weight given that testimony.  *In re McCarter*, 296 B.R. 750, 754 (Bankr. E.D. Tenn. 2003)

(citing *Nordhoff Invs., Inc. v. Zenith Electronics Corp.*, 258 F.3d 180, 191 (3d Cir. 2001)).  "The

objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert

testimony.  It is to make certain that an expert, whether basing testimony upon professional studies

or personal experience, employs in the courtroom the same level of intellectual rigor that

9

characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 119 S.

Ct. 1167, 1176 (1999).

Appraisers may fall within the scope of expert witnesses, and "the essential elements of the

real estate expert's competency include his knowledge of the property and of the real estate market

in which it is situated, as well as his evaluating skill and experience as an appraiser." *Whitehouse

Hotel, L.P. v. Comm'r*, 2008 WL 4757336, at *7, 2008 U.S. Tax Ct. LEXIS 28, at *15-16 (Tax Ct.

Oct. 30, 2008) (quoting *Hidden Oaks, Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998)

(emphasis omitted)).  In Tennessee, appraisers are required by statute to be licensed and to "comply

with the Uniform Standards of Professional Appraisal Practice promulgated by the appraisal

standards board of the appraisal foundation and any other duly established standards of the

commission[,]" to ensure "that real estate appraisals be performed in accordance with generally

accepted appraisal standards[.]" TENN. CODE ANN. § 62-39-329 (2009).

The Defendants argue that Mr. Fletcher, who values the Franklin Tract at $17,475,000.00 on

September 18, 2007, did not actually appraise the property but rather took the original purchase price

then readjusted and subtracted values for the four tracts not at issue here to arrive at his value for the

Franklin Tract.  The Defendants contend that this methodology does not comply with Rule 1-4(e)

of the Uniform Standards of Professional Appraisal Practice, which provides, in material part, that

"[w]hen analyzing the assemblage of the various estates or component parts of a property, an

appraiser must analyze the effect on value, if any, of the assemblage.  An appraiser must refrain from

valuing the whole solely by adding together the individual values of the various estates or component

parts." TRIAL EX. 28.  The Comment to Rule 1-4(e) offers the following further explanation:

10

> Although the value of the whole may be equal to the sum of the separate estates or parts, it also may be greater than or less than the sum of such estates or parts. Therefore, the value of the whole must be tested by reference to appropriate data and supported by an appropriate analysis of such data. A similar procedure must be followed when the value of the whole has been established and the appraiser seeks to value a part. The value of any such part must be tested by reference to appropriate data and supported by an appropriate analysis of such data.

TRIAL EX. 28. Accordingly, the Defendant, Gerald Franklin, Trustee, seeks to have Mr. Fletcher's testimony concerning the value of the Franklin Tract stricken based upon his alleged noncompliance with Rule 1-4(e) and pursuant to the following rule stated by the Tennessee Supreme Court:

> We are of the opinion the only way to arrive at this cash market value is to estimate the specific, identical land taken by placing a value upon it. This can only be done by a statement of facts, and by opinions and estimates of parties acquainted with the land and upon such facts, opinions, and estimates of the land must the valuation be based.

> By the rule laid down by the learned trial judge, the specific land taken is never valued. He directs the witnesses to value the whole tract, including the right of way, and then to value the remainder of the tract, excluding the right of way, and they are never permitted to value the land actually taken, but only to infer, by a process of subtracting the value of the remainder from the value of the whole tract, what is the value of the part taken. But the witnesses were not permitted to value the land taken, and this is what the law says they shall do.

*Wray*, 82 S.W. at 473.[5] The Plaintiff argues that *Wray* is inapplicable because, in addition to considering the original purchase price of the Franklin Tract paid by the Plaintiff to the Defendants,

---

[5] Following a jury trial to determine the value of a portion of two vacant lots owned by the Wrays and taken by the railroad company under the exercise of eminent domain, resulting in a jury verdict of $1,575.00, the Wrays appealed, calling into question, among other things, the following charge issued to the jury by the trial judge:

> "You are to arrive at the value of the property taken by considering what was the cash market value of the entire property in September, 1903, when it was taken for railroad purposes. After that is found, you are to ascertain what the market value of the remaining portion of the land was after cutting off the right of way, and whatever difference that makes is the actual value of the property taken, and the amount is to be allowed without deduction or being affected in any way by incidental damages or incidental benefits."

*Wray*, 82 S.W. at 472.

Mr. Fletcher also used comparable sales to arrive at his valuation. Moreover, the Plaintiff argues that the valuation in question in this adversary proceeding does not involve condemnation, eminent domain, incidental damages, or loss of right of way, all of which were present in *Wray*.

The court agrees that Mr. Fletcher's testimony should not be stricken, relying in part on the holding in *City of Murfreesboro v. Pierce Hardy Real Estate, Inc*., 2001 WL 1216992, 2001 Tenn. App. LEXIS 767 (Tenn. Ct. App. Oct. 12, 2001). Stating that "[t]he aim of the court in *Wray* was to prevent testimony that combined an assessment of damages to the land remaining with an assessment of the value of the land taken[,]" the Tennessee Court of Appeals summarized the decision as follows:

> In the *Wray* decision, the Tennessee Supreme Court held that an inference, or before and after, method of valuation is inappropriate. A before and after method is one in which the value of the land is computed as the difference between the value of the entire tract of land before the taking and the value of the land remaining after the taking. Thus, this method estimates any decrease in the value of the land remaining, not the value of the land taken.

*City of Murfreesboro*, 2001 WL 1216992, at *4-5, 2001 Tenn. App. LEXIS 767, at *12-13, *15 (citations and footnote omitted). Distinguishing *Wray*, the court of appeals found that an appraiser's methodology for valuing the entire tract of land and determining a price per acre, which it then multiplied by the acreage taken by the city to arrive at the value was proper and "[did] not constitute consideration of the decrease to value of the remaining portion of Landowner's property; rather it seeks to value the specific piece of land condemned." *City of Murfreesboro*, 2001 WL 1216992, at *5, 2001 Tenn. App. LEXIS 767, at *14-15. Furthermore, and in line with cases interpreting the federal rules of evidence as well, the court held that, subject to cross-examination and presentment of contrary expert testimony, "[t]he methodology used by the appraiser goes to the weight to be given

his opinion of the value of the land taken, and the trier of fact is the final arbiter as to the credibility and weight of testimony." *City of Murfreesboro*, 2001 WL 1216992, at *5, 2001 Tenn. App. LEXIS 767, at *15-16 (footnote omitted).

Mr. Fletcher testified that he believed the original $27,975,000.00 purchase price for the 1,865 acres comprising the Webb Mountain Property was indicative of fair market value at the time it was purchased in March 2006, but that he did not agree with the consideration assigned to each individual tract by the Defendants.[6] Therefore, in order to arrive at the $17,475,000.00 value for the Franklin Tract,  Mr. Fletcher used comparable sales to readjust the values of the other tracts making up the whole of the Webb Mountain Property and subtracted those totals from the $27,975,000.00 to arrive at the $17,475,000.00 figure, although he acknowledges that, under his readjusted values, two of the remaining tracts, the 71 acre Whaley Tract and the 195 acre Greenbrier Tract, were assigned per-acre values of $30,000.00 and $40,000.00, respectively, which could not be supported by any of the comparable properties he used, and he had based those per-acre values on his "judgment."

Although the fair market valuation of the Franklin Tract is at the heart of this adversary proceeding, it does not involve condemnation or eminent domain, which are governed by a whole body of case law.  Here, the valuation is the fair market value of willing buyers, inclusive of all considerations, including the property's highest and best use at the time of the assessment. Moreover, even though Mr. Fletcher testified that he arrived at the value of $17,475,000.00 by working backwards from the $27,975,000.00 paid by the Plaintiff for all five tracts comprising the

---

[6] *See supra*, n.3.

13

Webb Mountain Property in March 2006, he also used the nine comparable sales listed in his

appraisal report to arrive at the approximately $12,000.00 per acre price for the Franklin Tract,

irrespective of the fact that the Defendants do not agree with his numbers.  The court does not agree

that Mr. Fletcher's testimony should be stricken under either *Wray* or Rule 1-4(e) of the Uniform

Standards of Professional Appraisal Practice.  The Defendants' motion shall, therefore, be denied.

III

Pursuant to 11 U.S.C. § 1107(a) (2006), upon the filing of the bankruptcy case, the Plaintiff,

as debtor-in-possession, assumed the functions and duties of a trustee and in that capacity seeks to

avoid the transfer of the 1,445 acre Franklin Tract to the Defendant, Gerald Franklin, Trustee,

effectuated by the recording of the Franklin Quit Claim Deed on September 18, 2007, with the

property to be recovered for the benefit of the bankruptcy estate.  The Plaintiff grounds this

avoidance action on 11 U.S.C. § 544(b), which provides:

> (b)(1) Except as provided in paragraph (2) [concerning transfers of charitable
> contributions], the trustee may avoid any transfer of an interest of the debtor in
> property or any obligation incurred by the debtor that is voidable under applicable
> law by a creditor holding an unsecured claim that is allowable under section 502 of
> this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b).  Section § 544(b) permits the Plaintiff to "'stand in the shoes' of an unsecured

creditor and assert causes of action under state fraudulent conveyance laws for the benefit of all

creditors." *Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 330 (B.A.P. 6th Cir. 2007) (citations

omitted).  As evidenced by the plain language of the statute, "§ 544(b) contains four requirements:

(1) [a] creditor; (2) holding an allowable unsecured claim; and (3) a transfer of an interest of the

debtor in property; (4) that is voidable under applicable [state] law." *Forbes*, 372 B.R. at 330

14

(quoting *Belfance v. Bushey (In re Bushey)*, 210 B.R. 95, 100 (B.A.P. 6th Cir. 1997)).  Here, the
Plaintiff relies upon Tennessee's Uniform Fraudulent Transfer Act, specifically, Tennessee Code
Annotated §§ 66-3-305 and 66-3-306(a), as the applicable law incorporated into § 544(b).

In their Motion for Judgment on the Pleadings filed on March 3, 2009, the Defendants
asserted, as an affirmative defense, that the Plaintiff may not proceed under § 544(b) because that
statute applies only to pre-petition transfers, and in support thereof, cited to a body of case law,
including this court's decision in *Farmer v. Autorics, Inc. (In re Branam)*, 247 B.R. 440 (Bankr. E.D.
Tenn. 2000), and a recent opinion of the Sixth Circuit Bankruptcy Appellate Panel, *Reiser v.
Dinsmore & Shohl, LLP (In re Troutman Enterprises, Inc.)*, 356 B.R. 786, 2007 WL 205640, 2007
Bankr. LEXIS 678 (B.A.P. 6th Cir. Jan. 26, 2007).  Following a hearing on April 9, 2009, the court
found that there was a gap between the dismissal of the Plaintiff's bankruptcy case on September 17,
2007, and its reinstatement on February 8, 2008.  Therefore, at the time the four Quit Claim Deeds
in question were recorded on September 18, 2007, the Webb Mountain Property was "property of
the debtor" rather than "property of the estate," and the transfers thus fell within the purview of
§ 544(b).  *Webb Mtn, LLC v. Exec. Realty P'ship, L.P. (In re Webb Mtn, LLC)*, 2009 WL 1117469,
at *2, 2009 Bankr. LEXIS 1128, at *5-6 (Bankr. E.D. Tenn. Apr. 9, 2009).[7]

At the close of trial on September 28, 2009, the Defendants once again raised the issue,
arguing that the court's reliance on "property of the estate" versus "property of the debtor" language
in the statute is misplaced and a distinction without a difference since all property of the Plaintiff
became property of its estate when the case was commenced on June 25, 2007.  Once again, the court

---

[7] *See supra* n.4.

rejects the Defendants' argument.  While it is true that all interests of the Plaintiff in property became

property of its bankruptcy estate pursuant to 11 U.S.C. § 541 (2006) on June 25, 2007, it is also true

that once the case was dismissed on September 17, 2007, the automatic stay terminated, the

bankruptcy estate was dissolved, and all property re-vested in the Plaintiff pursuant to 11 U.S.C.

§ 349(b)(3), which provides as follows:

> (b) Unless the court, for cause, orders otherwise, a dismissal of a case other than
> under section 742 of this title—
>
> > (1) reinstates—
> >
> > > (A) any proceeding or custodianship superseded under section 543;
> > >
> > > (B) any transfer avoided under section 522, 544, 545, 547, 548, 549,
> > > or 724(a) of this title or preserved under section 510(c)(2), 522(i)(2),
> > > or 551 of this title; and
> > >
> > > (C) any lien voided under section 506(d) of this title;
> >
> > (2) vacates any order, judgment, or transfer ordered, under section 522(i)(1),
> > 542, 550, or 553 of this title; and
> >
> > (3) revests the property of the estate in the entity in which such property was
> > vested immediately before the commencement of the case under this title.

11 U.S.C. § 349(b) (2006); *see, e.g., Armel Laminates, Inc. v. The Lomas & Nettleton Co. (In re*

*Income Prop. Builders, Inc.)*, 699 F.2d 963, 965 (9th Cir. 1982) ("After an order of dismissal, the

debtor's debts and property are subject to the general laws, unaffected by bankruptcy concepts.").

It was only through dismissal of the case, termination of the automatic stay under § 362(c),[8]

and the re-vesting of estate property in the Plaintiff under § 349(b)(3) that the Defendants were

---

[8]  "(1) [T]he stay of an act against property of the estate . . . continues until such property is no longer property
of the estate; (2) the stay of any other act . . . continues until the earliest of . . . (B) the time the case is dismissed[.]"  11
U.S.C. § 362(c) (2006).

authorized to exercise their rights under state law and record the Franklin Quit Claim Deed on September 18, 2007.  When the case was reinstated on February 8, 2008, all interests in property held by the Plaintiff again became property of the estate and the automatic stay once again went into effect, as if the case had been "re-commenced."   Accordingly, because of these unusual circumstances, the Plaintiff's bankruptcy case has, in essence, two dates for the purposes of establishing the Plaintiff's rights as a debtor:  June 25, 2007, the original petition date, and February 8, 2008, the date upon which the case was reinstated.   Under the intricacies of the Bankruptcy Code, all events that occurred during the gap period between dismissal and reinstatement were covered by neither the automatic stay nor the cloak of bankruptcy.  Thus, the September 18, 2007 recordation of the Franklin Quit Claim Deed transferring the 1,445 acre Franklin Tract to the Defendant, Gerald Franklin, Trustee, did not run afoul of the automatic stay.   However, the recordation of the Franklin Quit Claim Deed did, in fact, constitute a "transfer of an interest of the debtor in property," and the Defendants cannot argue that the gap period is of no consequence with respect to an application of § 544(b) when they have argued – and rightfully so – that the gap period must be taken into account with respect to § 362(a).[9]  As such, § 544(b) applies to the September 18, 2007 recordation of the Franklin Quit Claim Deed, which can be characterized as a pre- and post-petition transfer of the Plaintiff's interest in the Franklin Tract.

---

[9] Like § 544(b), which uses the "interest of the debtor in property" language, § 362(a)(5) states that the filing of a petition operates as a stay of "any act to create, perfect, or enforce against *property of the debtor* any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title[.]"  11 U.S.C. § 362(a)(5) (emphasis added).

# IV

Under the purview of § 544(b), the Plaintiff seeks to avoid the transfer of the 1,445 acre Franklin Tract effectuated by the September 18, 2007 recordation of the Franklin Quit Claim Deed pursuant to § 66-3-305(a)(2), relating to transfers which are deemed fraudulent as to present and future creditors, and § 66-3-306(a), relating to transfers which are deemed fraudulent as to present creditors.  Tennessee Code Annotated § 66-3-305(a) provides:

> (a)  A transfer[10] made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> . . . .
>
> > (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TENN. CODE ANN. § 66-3-305.  Similarly, Tennessee Code Annotated § 66-3-306(a) provides that:

> (a)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

---

[10]  "Transfer" is a defined term under Tennessee law, meaning, with respect to both statutes relied upon by the Plaintiff, "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance[.]"  TENN. CODE ANN. § 66-3-302(12) (2004).

TENN. CODE ANN. § 66-3-306(a).  "Whether a transfer is fraudulent is determined by the facts and

circumstances of each case[,]" *Macon Bank & Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn.

Ct. App. 1986).   The requirements of these constructive fraud statutes have been succinctly

summarized as follows:

> Reading the two constructive fraud statutes together, they require proof that:
>
>> The debtor did not receive reasonably equivalent value in exchange for the transfer; *and*
>>
>> (1) the debtor was engaged in or about to engage in business or transaction for which [its] remaining assets were unreasonably small in relation to the business or transaction; *or*
>>
>> (2) the debtor intended to incur, or believed or reasonably should have believed that [it] would incur debts beyond [its] ability to pay as they became due; *or*
>>
>> (3) the debtor was insolvent at the time of the transfer or was rendered insolvent by the transfer.

*Farinash v. Silvey (In re Silvey)*, 378 B.R. 186, 190-91 (Bankr. E.D. Tenn. 2007) (citations omitted).

The Plaintiff bears the burden of proving, by a preponderance of the evidence, every element of its

argument:  that it received less than reasonably equivalent value in exchange for the 1,445 acres

transferred under the Franklin Quit Claim Deed, and that it either became insolvent as a result of the

transfer accomplished through the Franklin Quit Claim Deed or that the transfer left the Plaintiff with

remaining assets unreasonably small in relation to the business or transaction in which it was about

to engage.[11] *Forbes*, 372 B.R. at 330.

---

[11] There is no dispute that the Plaintiff had unsecured creditors possessing allowable unsecured claims. *Webb Mtn, LLC v. Exec. Realty P'ship, L.P. (In re Webb Mtn, LLC)*, 414 B.R. 308, 356 (Bankr. E.D. Tenn. 2009).

There is no real dispute that the Plaintiff was insolvent on September 18, 2007, or that it was rendered insolvent as a result of the transfer of the Franklin Tract.  Insolvency is defined by statute as follows:  "(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation[; and] (b) A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent[,]"  TENN. CODE ANN. § 66-3-303 (2004).  "Debts" under this statute include only those debts "in existence when the conveyance is made."  *Crocker v. Ryan*, 914 S.W.2d 551, 553 (Tenn. Ct. App. 1995).[12]  At trial, Mr. Collier testified that once the Franklin Quit Claim Deed was recorded on September 18, 2007, the Plaintiff's sole property consisted of the 131-acre M&A Tract valued at approximately $1,000,000.00, a checking account containing $1,100.00, and two refund claims owed by Corbin Capital and Cambridge in the aggregate amount of $54,000.00, whereas the Plaintiff's debts totaled $6,845,512.73, including $6,349,289.00 owed to Mr. Collier, $450,000.00 owed to Whaley & Sons, Inc. and Southern Design Group, Inc., $22,416.14 owed to Quarles & Brady, $21,733.59 owed to the Tennessee Department of Revenue, and $2,074.00 owed to the Sevier County Trustee.  *See* COLL. TRIAL EX. 8; COLL. TRIAL EX. 18; COLL. TRIAL EX. 19.  Accordingly, to find the September 18, 2007 recordation of the Franklin Quit Claim Deed constructively fraudulent and, therefore, avoidable, the Plaintiff must satisfy the first element and prove that it received less than reasonably equivalent value when the Franklin Quit Claim Deed was recorded.

---

[12] A "debt" is defined as "liability on a claim[,]" and "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]"  TENN. CODE ANN. § 66-3-302(3), (5) (2004).

In support of its position, the Plaintiff introduced into evidence Mr. Fletcher's testimony and appraisal report valuing the 1,445 acre Franklin Tract[13] at $17,475,000.00 as of September 18, 2007. TRIAL EX. 23.  The Plaintiff also argues that the original consideration for the Franklin Tract was $9,200,000.00[14] in March 2006, but that the debt owed to the Defendant, Gerald Franklin, Trustee, had been paid down at the time of the transfer to $8,382,328.37, and, based upon this figure, without regard to the Fletcher appraisal, this Defendant received a windfall of $817,671.63, evidencing that the transfer was not for reasonably equivalent value.  COLL. TRIAL EX. 2; TRIAL EX. 17.  On the other side and in support of its contention that the Plaintiff received reasonably equivalent value, the Defendants relied on the testimony of Mr. Evans, Mr. Whaley, and Mr. Franklin that the Plaintiff received satisfaction of its antecedent debt owed on all of the nonrecourse Promissory Notes and, with respect to the Franklin Note specifically, satisfaction of the $8,382,328.37 balance.  The Defendants also offered into evidence Mr. White's testimony and appraisal report indicating that the value of the Franklin Tract on September 18, 2007, was $6,000,000.00, a figure substantially lower than the debt which was still owed and satisfied in full.

**A**

"Whether a conveyance has been made for a fair consideration is generally a question of fact[,]" *Cate v. Thomas*, 2005 WL 3416316, at *6, 2005 Tenn. App. LEXIS 781, at *17 (Tenn. Ct.

---

[13] Other witnesses testified that the Franklin Tract consists of 1,440 acres while Mr. Fletcher and Mr. White refer to this tract as consisting of 1,445.67 acres and 1,447 acres, respectively.  The difference is inconsequential and of no significance.  The court has, throughout this Memorandum, except when referring to the testimony of Mr. White, deemed the Franklin Tract to consist of 1,445 acres.

[14] *See supra* n. 3.

21

App. Dec. 14, 2005), requiring courts to first determine whether any value was received and if so, whether it was reasonably equivalent value.  Tennessee Code Annotated defines "value" as follows:

> (a)  Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

> (b)  For the purposes of §§ 66-3-305(a)(2) and 66-3-306, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

> (c)  A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

TENN. CODE ANN. § 66-3-304 (2004).  There is no dispute, and the record reflects, that value was exchanged when the Franklin Quit Claim Deed was recorded on September 18, 2007, based upon the satisfaction of the Plaintiff's antecedent debt owed to the Defendant, Gerald Franklin, Trustee, on the non-recourse Franklin Note, and the inquiry is whether it was reasonably equivalent value.

"[V]aluation considerations are inherently fact-laden, turning on the case-specific circumstances surrounding the debtor's decision to enter into the challenged transaction[,]" *Lowe v. B.R.B. Enters., Ltd. (In re Calvillo)*, 263 B.R. 214, 200 (W.D. Tex. 2000), and "the contractual right to receive payment in the event that it turns out well is obviously worth something.  *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 771 (6th Cir. 1995).  "In assessing whether a challenged transfer is supported by reasonably equivalent value, courts generally compare the value of the property transferred with the value of that received in exchange for the transfer."  *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 707 (6th Cir. 1999).  "'Reasonable equivalence' does not require

22

exact equality in value[,]" *Kendall v. Carbaat (In re Carbaat)*, 357 B.R. 553, 560 (Bankr. N.D. Cal.

2006), and "courts do not apply a mathematical formula but consider the circumstances of the

particular case." *Bigger v. Fields*, 2005 WL 2043762, at *3-4, 2005 Tenn. App. LEXIS 530, at *10-

11 (Tenn. Ct. App. Aug. 24, 2005) (citing *Meacham v. Haley*, 270 S.W.2d 503 (Tenn. Ct. App.

1954)).  A determination of reasonably equivalent value "depends on the circumstances of each case

and not on a fixed mathematical formula[,]" with fair market value one factor to be considered.  *Lisle*

*v. John Wiley & Sons, Inc. (In re Wilkinson)*, 196 Fed. Appx. 337, 341-42, 2006 WL 2380887, at *4,

2006 U.S. App. LEXIS 21167, at *10 (6th Cir. Aug. 17, 2006).  Reasonably equivalent value can also

include the elimination of claims or litigation within the scope of satisfaction of an antecedent debt."

*Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 442 (Bankr. D. Idaho 2008).

With the exception of § 66-3-304(b), relating to regularly conducted, noncollusive

foreclosure sales, the term "reasonably equivalent value" is not defined by statute.  Nevertheless,

"reasonably equivalent value is not an esoteric concept:  a party receives reasonably equivalent value

for what it gives up if it gets 'roughly the value it gave[,]'" *WFB, LLC v. Campbell Soup Co.*, 482

F.3d 624, 631 (3d Cir. 2007) (quotation omitted), and it is not limited "to money nor to value

transferred pursuant to a valid contract."  *For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560

F.3d 717, 722 (7th Cir. 2009).  The Sixth Circuit has stated the following with respect to reasonably

equivalent value:

> The BAP noted correctly that "reasonably equivalent" is not defined by the
> Bankruptcy Code, but focus has been placed upon the consideration received by the
> debtor, not the value given by the transferee:
>
> > [T]he proper focus is on the net effect of the transfers on the debtor's
> > estate, the funds available to the unsecured creditors.  As long as the

unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

*Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 484 (4th Cir. 1992). "[I]t is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1125-26 (5th Cir. 1995).

*Congrove v. McDonald's Corp. (In re Congrove)*, 222 Fed. Appx. 450, 454, 2007 WL 130414, at *3, 2007 U.S. App. LEXIS 764, at *9-10 (6th Cir. Jan. 10, 2007).[15]  In essence, "[a] determination of reasonably equivalent value is 'fundamentally one of common sense, measured against market

---

[15] *Congrove* analyzes reasonably equivalent value under Ohio's version of the Uniform Fraudulent Transfer Act and 11 U.S.C. § 548(a), which states, in material part:

(a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made . . ., or became insolvent as a result of such transfer . . .; [or]

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

11 U.S.C. § 548(a) (2006).  As has been noted by many courts determining reasonably equivalent value, it is proper to look to the Bankruptcy Code and cases from other jurisdictions for guidance and as persuasive authority.  *See Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 594 (9th Cir. 1991); *Dearborn St. Bldg. Assocs. LLC v. D & T Land Holdings*, LLC, 2009 WL 3011245, at *5, 2009 U.S. Dist. LEXIS 84730, at *14-15 (W.D. Mich. Sept. 16, 2009); *Hitt v. Ng (In re All Am. Bottled Water Corp.)*, 2009 WL 722994, at *3, 2009 Bankr. LEXIS 712, at *8 (Bankr. W.D. Wash. Mar. 17, 2009); *see also Holcomb Health Care Servs., LLC v. Quart Ltd., LLC (In re Holcomb Health Care Servs., LLC)*, 329 B.R. 622, 671 (Bankr. M.D. Tenn. 2004) (likening fraudulent conveyances under § 548(a)(1)(B) to those under § 66-3-305).  The same is true in Tennessee.  *See Rushing v. Hershey Chocolate-Memphis*, 234 F.3d 1269 (Table), 2000 WL 1597849, at *2 n.3, 2000 U.S. App. LEXIS 27392, at *5 n.3 (6th Cir. Oct. 19, 2000) (citing *Holiday Inns, Inc. v. Olsen*, 692 S.W.2d 850, 853 (Tenn. 1985)); *Hickman v. Turitto*, 2007 WL 2892788, at *4, *6, 2007 U.S. Dist. LEXIS 73258, at *11, *16 (E.D. Tenn. Sept. 28, 2007) ("[I]n enacting a uniform law [the Uniform Fraudulent Transfer Act, on April 23, 2003,] the Tennessee Legislature evinced the intent of harmonizing their laws with the laws of other states who had previously or will subsequently enact the statute.").

reality.'" *Lindquist v. JNG Corp. (In re Lindell)*, 334 B.R. 249, 256 (Bankr. D. Minn. 2005) (quoting *Leonard v. Mylex Corp. (In re Northgate Computer Sys., Inc.)*, 240 B.R. 328, 365 (Bankr. D. Minn. 1999)).

The question as to whether the Plaintiff received reasonably equivalent value requires the court to determine the value of the Franklin Tract, and in order to do so, it must attempt to reconcile the considerable disparity between Mr. Fletcher's value of $17,475,000.00 with Mr. White's value of $6,000,000.00.   Although  "[t]he best evidence of the fair market value of a property would be a sale, . . . in the absence of a sale the Court may rely upon other valuation methodologies[,]" including the testimony of expert real estate appraisers.  *In re Hannigan*, 2005 WL 3275485, at *1, 2005 Bankr. LEXIS 2445, at *4 (Bankr. D. Mass. Oct. 3, 2005).  When, as is the case here, there are vastly discordant appraisals, the court possesses wide discretion, "may largely accept the opinion of one party's expert over that of the other party's expert, [and] may be selective in determining what portions of each expert's opinion, if any, to accept."  *Whitehouse Hotel L.P.*, 2008 WL 4757336, at *21, 2008 U.S. Tax Ct. LEXIS 28, at *62.

> No one approach is correct in every case.  All relevant factors to property value must be considered to arrive at a just valuation of a property. . . . [T]he Court must review the evidence in the record which supports or refutes the conflicting opinions of the expert appraisal witnesses and the facts and assumptions which form the basis for their opinions.  The Court is not bound by the opinion of any expert witness and may accept or reject expert testimony in the exercise of sound judgment.

*River Valley Fitness One Ltd. P'ship v. City of Lebanon (In re River Valley Fitness One Ltd. P'ship)*, 2006 WL 618442, at *8, 2006 Bankr. LEXIS 345, at *24-25 (Bankr. D.N.H. Mar. 7, 2006) (citations omitted).

"[B]ecause valuation necessarily involves an approximation, the figure at which [the court] arrive[s] need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence." *Whitehouse Hotel L.P.*, 2008 WL 4757336, at *21, 2008 U.S. Tax Ct. LEXIS 28, at *62 (citations omitted).  In summary,

> There is no word used in the bankruptcy court which is more elusive than the word value.  It is not surprising how many different results are had when more than one person looks at a piece of real estate.  The real test, of course, is when the deal is closed in connection, therewith, after a reasonable willing buyer and a reasonable willing seller, neither being under duress, have reached an agreement on price in the open market.  Short of the real test, determining the value of property is a difficult task, made more difficult . . . [when] the figures arrived at by both sides are so [far apart].

> Value is subject to fluctuations caused by market fluctuations, changes in interest rates and general economic factors. . . . The Court listens to evidence of value and must determine which appraisal figure to fix upon.  In making that determination, the Court is not bound by any figure in particular, but merely guided by them all.  This is because "[a]n appraisal of a property is not the result of a scientific analysis," but is, rather, a subjective opinion which can and does differ from the next appraisal even though both may be based on real estate market trends.

*Houghton v. Marcella (In re Marcella)*, 2009 WL 3348251, at *12, 2009 Bankr. LEXIS 3380, at *39-40 (Bankr. D. Mass. Oct. 15, 2009) (quoting *In re Rehbein*, 49 B.R. 250, 252-53 (Bankr. D. Mass. 1985) (citations and footnote omitted)).

Both parties presented expert testimony from experienced state-licenced appraisers as to the value of the Franklin Tract when it was transferred on September 18, 2007, with Mr. Fletcher valuing the property at approximately $12,000.00 per acre for a total of $17,475,000.00 and Mr. White assigning a value of approximately $4,050.00 per acre for a total of $6,000,000.00.  As evidenced by their respective appraisal reports and confirmed by their testimony, both appraisers

primarily utilized the sales comparison approach[16] in arriving at their values.  Nevertheless, with the exception of one property, the Three Sisters Mountain property consisting of approximately 5,000 acres[17] located at East Millers Cove Road in Walland, Tennessee, which sold on July 1, 2007, for $19,143,025.00, Mr. Fletcher and Mr. White did not use the same comparable sales.

Mr. Fletcher's report describes "the neighborhood" analyzed to include properties in Sevier, Blount, Cocke, Monroe, Campbell, and Claiborne counties; however, he testified that he used nine comparable sales between February 2005 and July 2007, with three of the sales located in Blount County and six located in Sevier County, because they were the most representative of and similar to the overall concept and development potential of the Webb Mountain Property.  The comparable sales relied upon by Mr. Fletcher range in property size from 100.00 to 5,071.00 acres, in total sales price from $2,107,158.00 to $19,143,025.00, and yield price per acre valuations ranging from $3,775.00 to $25,000.00.  *See* Trial Ex. 23, at 25-30.  His comparable sales, which are summarized below, represent the raw land price for mountainous terrain; however, as Mr. Fletcher testified at

---

[16] With respect to the sales comparison approach, Mr. Fletcher's report states the following:

[T]he sales comparison approach is most effective when a number of comparable properties have recently sold or are currently for sale in the subject property's market.  In this approach, a value estimate is developed by comparing the subject property with similar properties, called comparable sales.  The Sales prices of the properties that are judged the most comparable tend to indicate a range in which the value indication for the subject property will fall.  Adjustments are made for the degree of similarity or dissimilarly [sic] between the subject property and the comparable sales by considering various elements of comparison.

Trial Ex. 23, at 23.  Mr. White's appraisal report describes the "Direct Sales Comparison Approach" as "[t]his approach, also erroneously called the Market Approach, develops a value estimate by direct sales comparison of properties with the subject that are similar in nature or have adapted to the same use which have recently sold in the open market under competitive conditions."  Trial Ex. 24, at 15.

[17] Mr. Fletcher's appraisal report lists the size of the Three Sisters Mountain property at 5,071.00 acres, with a price per acre of $3,775.00, while Mr. White's appraisal report lists the size at 5,010.88 acres, with a price per acre of $3,820.00.  *Compare* Trial Ex. 23 *with* Trial Ex. 24.

trial, none includes river frontage.[18]  Additionally, each property has, at a minimum, electricity, with

several also having telephone and/or water:

| Property Name / County | Sale Date | Sale Price | Acreage | Price/Acre |
|---|---|---|---|---|
| | | | | |
| Camp Montvale / Blount | Dec. 2006 | $4,000,000.00 | 363.94 | $10,991.00 |
| Overlook at Camp Montvale / Blount | July 2006 | $2,107,158.00 | 281.85 | $7,476.00 |
| The Homestead / Sevier | Dec. 2005 | $2,364,957.00 | 354.00 | $6,681.00 |
| Norton Creek / Sevier | May 2005 | $4,000,000.00 | 200.00 | $20,000.00 |
| Norton Creek / Sevier | Mar. 2007 | $2,500,000.00 | 100.00 | $25,000.00 |
| Cove Mountain / Sevier | Feb. 2005 | $5,687,500.00 | 942.85 | $6,032.00 |
| Three Sisters Mountain / Blount | July 2007 | $19,143,025.00 | 5,071.00 | $3,775.00 |
| Summit at Bluff Mountain / Sevier | Mar. 2006 | $8,000,000.00 | 499.27 | $16,023.00 |
| Bottom Flats / Sevier | Apr. 2006 | $6,050,000.00 | 304.00 | $19,901.00 |

*See* TRIAL EX. 23, at 25-30.  Mr. Fletcher summarizes his analysis of the foregoing properties as

follows:

> As shown, *raw land* prices vary from a low of approximately $4,000/acre for a 5,000
> acre tract in Blount County to $20,000-$25,000/acre for a 300 acre tract in Sevier
> County.
>
> One of the major problems when analyzing mountain property sales is in determining
> how much of the land is economically developable and, when scenic views are a
> primary asset of the property, how many lots can be marketed as having such
> attributes versus interior wooded lots that do not have view sheds.  Another problem
> relates to potential development costs.  Rock, steep terrain, adverse soil conditions,
> and other negative site characteristics can drastically affect the number of
> developable building sites and thus affect sales prices.

_____

[18] The Franklin Tract consists of undeveloped property having typical mountain topography, including heavily wooded areas of different grades of elevation ranging from 1,200 to 3,000 feet, a mountain ridge top, and frontage along the Little Pigeon River.  *See* TRIAL EX. 23, at 16-17; TRIAL EX. 24, at 8, 10-11, 71.

TRIAL EX. 23, at 30.  He does not include photographs of the properties but the summary for each

comparable contains the following corresponding remarks:

| Property Name | Remarks |
|---|---|
| | |
| Camp Montvale | Formerly "Camp Montvale."  Property purchased for future residential development.  Improvements to the land include 15 residential units - most used as cabins for campers - barns, pool, bathhouse, tennis court, and related camp oriented improvements. |
| Overlook at Camp Montvale | The property has been plotted for an 80 lot gated residential development. Amenities include underground utilities, a clubhouse, pool, guest cottage, two (2) open air pavilions, hiking and biking trails.  Phase #01 consists of 24 lots ranging in price from $295,000 to $495,000 on 131.85 acres.  Phase #02 will have 54 lots on 150 acres priced similarly. |
| The Homestead | Purchased for resort development. |
| Norton Creek | Part of "The Enclave" and "The Estates" developments located between Pigeon Forge and Gatlinburg but within the city limits of Gatlinburg.  Part of a larger tract containing over 3,000 acres which adjoins the Great Smoky Mountains National Park.  Property has been developed into high-end residential lots. Excellent mountain views. |
| Norton Creek | Remaining part of 125-010.00 ("The Enclave" and "The Estate") |
| Cove Mountain | The property was in two contiguous tracts.  Tract #01 consisted of 69.38 acres while Tract #02 consisted of balance of the property (873.47).  The only access to Tract #02, bounded on the north by the Foothill parkway and to the south by the National Park, is a 40 foot ROW easement across the land owned by the Federal Government (Great Smoky Mountains National Park).  Tract #01 is landlocked except across Tract #02. |
| Three Sisters Mountain | New Forestry, LLC (Grantor) purchased property from Keith Lane on March 5, 1998 (0601-0301) for a recorded consideration of $6,650,000.00.  Property was listed for sale in 2006 for $15,000,000.  Subsequent bidding drove price to approximately $19,000,000 according to Jake Almond, listing agent for New Forestry. |
| Summit at Bluff Mountain | A portion of The Summit at Bluff Mountain.  The first phase was planned for 96 lots on 312 acres.  Purchased in two tracts.  Tract #01 consisted of 390.79 acres, purchased for $6,252,640 ($16,000/acre).  The second contiguous tract contained 109.21 acres and was purchased for $1,747,360 ($16,000/acre).  [sale dates of January 30, 2006, and March 31, 2006] |
| Bottom Flats | This property has frontage along both sides of Wears Valley RD near the Cove Mountain Development.  The purchaser was the adjoining land owner. |

*See* Trial Ex. 23, at 25-30.  At trial, Mr. Fletcher testified that, to the best of his knowledge, none

of the foregoing comparables was zoned C-2, General Business Commercial, which he described as

Sevier County's "most permissive commercial zone," and of which approximately 1,100 acres of

the Franklin Tract is zoned.  Trial Ex. 23, at 18.

With respect to his valuation of the Franklin Tract, Mr. Fletcher testified that he visited the

Webb Mountain Property in July 2009, but he did not physically go onto the Franklin Tract.  He

included in his appraisal report the sale information from March 2006, concerning the individual

tracts comprising the 1,865 acre Webb Mountain Property which totaled $27,975,000.00, an amount

that he repeatedly testified at trial was, in his expert opinion, indicative of the fair market value of

the whole.  Nevertheless, Mr. Fletcher opined that the values of the individual tracts themselves were

not reasonable, stating that the unit values of three – the Greenbrier Tract with a per acre value of

$53,474.00, the Executive Realty Tract with a per acre value of $46,948.00, and the Whaley Tract

with a per acre value of $67,406.00 – were over-valued, while the per acre value of $6,364.00 for

the Franklin Tract was under-valued.  Accordingly, he readjusted the values to be assigned to each

individual tract utilizing the same total purchase price of $27,975,000.00 as follows:

| Tract | Acreage | Stated Value/ Consideration | Corresponding Price/Acre | Fletcher Value | Fletcher Price/Acre |
|---|---|---|---|---|---|
| | | | | | |
| Greenbrier | 195.89 | $ 10,475,000.00 | $ 53,474.00 | $  4,897,250.00 | $ 25,000.00 |
| Executive Realty | 21.30 | $  1,000,000.00 | $ 46,948.00 | $     852,000.00 | $ 40,000.00 |
| Whaley | 71.21 | $  4,800,000.00 | $ 67,406.00 | $  2,136,300.00 | $ 30,000.00 |
| Franklin | 1,445.67 | $  9,200,000.00 | $  6,364.00 | $ 17,458,250.00 | $ 12,000.00 |
| M&A | 131.56 | $  2,500,000.00 | $ 19,003.00 | $  2,631,200.00 | $ 20,000.00 |

TRIAL EX. 23, at 34-35.  On cross-examination, Mr. Fletcher acknowledged that the price per acre

values of $30,000.00 and $40,000.00, respectively, assigned to the Whaley and Executive Realty

Tracts were not supported by any of the comparison sales but were, instead, based upon his

"judgment."

With respect to the highest and best use of the Webb Mountain Property, Mr. Fletcher's

report contains the following assessment:

> As of the effective date of this report, subject property was zoned for a multitude of
> commercial and residential land uses.  It has the physical characteristics to allow for
> a planned residentially oriented community.   Necessary utilities for such a
> development were considered to be economically feasible.  The property was zoned
> and approved by Sevier County for such land uses.  According to a December 14,
> 2006 draft study by Christopher Stallings, MAI, CCIM a Senior Analysis with the
> Intregra [sic] Realty Resources the proposed concept plan was considered to be
> financially feasible.
>
> Based on this the *highest and best use* of the property was considered to be its
> proposed use as a planned resort development in accordance with the approved
> concept plan.

TRIAL EX. 23 at 22.  He summarizes his conclusions as follows:

> The effective date of this appraisal is September 18, 2007. As of that date parcel
> 098-014.00 [the Franklin Tract], along with the other four parcels, would be
> classified as unimproved *raw land*.   However, as of that date the following
> entitlements and permits had been approved for the real estate venture.
>
> •    The majority of the land in parcel 098-014.00 [the Franklin Tract] had been
>      zoned for commercial development making it the largest tax parcel within the
>      jurisdiction of the Sevier County Planning Commission to obtain such
>      zoning.  The remaining parcels remain within the agricultural zoning district.
>
> •    A concept plan for the *Pinnacles at Webb Mountain* resort development had
>      been approved by the Sevier County Planning Commission.
>
> •    A storm water discharge permit had been obtained from the Tennessee
>      Department of Environment and Conservation.

31

- A land disturbance permit had been obtained from the Sevier County Stormwater Management Department.

- A feasibility/perspective investment study had been made by the national real estate firm, Integra Realty Resources based in Houston, Texas.

- It is my understanding that +/- $900,000 had been spent on site work, etc. for the proposed development.

The *highest and best use* of the five parcels is considered to be for the intended resort development as reflected in the approved concept plan. Subject property, representing approximately 75% of the total acreage, serves as the focal point for the development.

TRIAL EX. 23, at 36.

For his analysis, Mr. White included within "the neighborhood" Blount, Sevier, Jefferson, Monroe, Rhea, Scott, Campbell, and Polk counties, researching large acreage mountainous tracts and those with water frontage, actually utilizing twenty-one comparables, including four in Blount County, one in Campbell County, two in Claiborne County, one in Cocke County, one in Fentress County, seven in Monroe County, two in Polk County, one in Roane County, and two in Sevier County, with the dates of sale ranging from March 2003 through February 2008, property size ranging from 9.86 to 5,010.00 acres, sales price ranging from $59,900.00 to $19,143.025, and price per acre value ranging from $836.00 to $12,064.00. *See* TRIAL EX. 24, at 28-66. Of those twenty-one properties, Mr. White focused his attention on the following five sales with respect to the Franklin Tract:

| Property Name/County | Sale Date | Sale Price | Acreage | Price /Acre |
|---|---|---|---|---|
| | | | | |
| Boatland & Lost Cane Rds. / Fentress | Aug. 2006 | $ 4,807,125.00 | 4,158.89 | $ 1,156.00 |
| Flatwoods Lane / Campbell | Feb. 2005 | $ 8,000,000.00 | 1,927.63 | $ 4,150.00 |
| Slopes of English Mountain / Sevier | Dec. 2003 | $ 3,845,000.00 | 2,074.90 | $ 1,853.00 |
| Payne Hollow Rd. / Blount | Mar. 2004 | $ 1,000,000.00 | 1,196.49 | $  836.00 |
| Three Sisters Mountain / Blount | July 2007 | $ 19,143,025.00 | 5,010.88 | $ 3,820.00 |

*See* TRIAL EX. 24 at 37-38, 43-44, 48-49, 52-53, 66, 71.  Each property analysis contains a

photograph of the property and the following corresponding remarks:

| Property Name | Remarks |
|---|---|
| | |
| Boatland & Lost Cane Roads | These tracts were advertised in the open market at $5,250,000 and sold to the Nature Conservancy for $4,708,925.  This property was exposed on the market for 138 days.  It has views of the East Fork of the Obey River Valley.  It is located west of Jamestown. |
| Flatwoods Lane | This property consists of a tract near Caryville, Tennessee, purchased by a company associated with Mike Ross, who develops the Rarity Communities.  It is wooded and mountainous.  Verified by Mike Ross. |
| Slopes of English Mountain | The Eagle Rock Development, LLC purchased this tract to develop The Preserve at English Mountain, a luxury mountain development.  It has panoramic views. The buyers indicate that this purchase was below market in a "pre-distress" sale. This is lower compared to some of the other mountain tracts, but its size represents one of the larger tracts.  Other tracts purchased include 173.05 acres from A. Romines in August 2008 for $961,252, or $5,555 per acre.  They purchased four other small tracts in August and December 2008.  The purchase price for the 2,265 aggregate acres was $5,095,920, which averaged $2,250 per acre.  The development has poor results in lot sales due to the recession and loss of 401K savings by potential purchasers. |
| Payne Hollow Road | This tract consists of mountainous [sic] near the Foothills Parkway in Walland. It has paved road access.  The sale was qualified by the Property Assessor.  A later sale dated November 16, 2004, for $1,300,000 is not an arm's-length transaction. |
| Three Sisters Mountain | Large tract in Blount County near Walland purchased for development of an upscale residential subdivision, and mountain community.  The property offers views of the Great Smoky Mountains National Park. |

33

*See* TRIAL EX. 24 at 37-38, 43-44, 48-49, 52-53, 66.  At trial, Mr. White testified that although he

considered all five of the foregoing properties, he relied primarily on the Flatwoods Lane and Three

Sisters Mountain transactions as comparable sales due to their larger size, similar attributes, and

similar intended development plans to the Webb Mountain Property.  *See also* TRIAL EX. 24, at 72.

With respect to the value of the Webb Mountain Property, Mr. White testified that he visited

the property in July 2009, before researching and compiling his comparative sales.  He testified that

he appraised each tract separately but that he did not believe the original $27,975,000.00 was

representative of the fair market value when the Plaintiff purchased it.  He opined that the highest

and best use of the land was, as follows:

> As vacant, the highest and best use of the site was to remain vacant, development of
> resort and tourist-oriented development, or to place in the hands of a conservation
> organization for permanent protection against development.  In collecting and
> analyzing data, I have found that land prices are similar for each of these uses.  The
> debtor anticipated development of a golf course, hotel, condominiums, and single-
> family homes, and conservation of a green area.

TRIAL EX. 24, at 27.  Looking at the Webb Mountain Property through the individual tracts and as

a whole, Mr. White summarized the following:

> The four tracts have a combined area of 1,735.7 acres.  As a single tract, it features
> the best attributes of the individual tracts.  It has both river frontage and mountain
> views and valley views.  It has an access via a concrete and steel bridge between the
> Little Pigeon River and Pittman Center Road.  The most obvious data available for
> comparability include the large tracts.  I concluded earlier in the report that the
> portion of the 195.89-acre tract that does not have direct river frontage has a similar
> unit value to the 1,447-acre tract.  Analyzed individually, the properties with river
> front influence appraised for $8,000 per acre on March 27, 2007, and $8,100.00 per
> acre on September 18, 2007, or about double the value indication of the large
> mountainous tracts without river front influence.

TRIAL EX. 24, at 77.

Based upon his opinion that the original $27,975,000.00 paid for the Webb Mountain Property as a whole was reasonable, Mr. Fletcher started with that number and reworked the overall values of the individual tracts to arrive at his valuation for the Franklin Tract. He also took into account, and, as evidenced in his report, placed a considerable emphasis both on the entitlements afforded the property as a whole as well as the concept and development plans for the property as a whole:

> Ten sales were included in this report. Raw land prices vary from a low of approximately $4,000/acre for a 5,000 acre tract in Blount County to $20,000-25,000/acre for 300 acres in Blount County. However, to the best of my knowledge none of these sales reflect the entitlements to the properties as were available to subject land as of the effective date of this appraisal.[19]

TRIAL EX. 23, at 37. On the other side, Mr. White testified that he did not believe the C-2 zoning mattered a great deal when determining highest and best use, nor did he think that the existence of the Concept Plan and/or the entitlements enhanced the value, and, therefore, the only improvement he mentioned in his appraisal report was bridge access across the Little Pigeon River. TRIAL EX. 24, at 26. Additionally, both appraisers testified that there is an inverse relationship between the size of property and its value per acre, with smaller tracts tending to sell at a higher price per acre while larger tracts tended to sell at a lower per acre price.

The court acknowledges the inherent difficulties, as testified to by Mr. Fletcher, facing appraisers when appraising mountain property, such as the sheer size of the property, the lay of the

---

[19] In actuality, only nine sales were utilized in Mr. Fletcher's final report. One additional sale had been listed in a draft appraisal report but was removed before he made his final conclusions. *Compare* TRIAL EX. 23 *with* TRIAL EX. 26. In addition, the reference to raw land prices of $20,000-$25,000.00 per acre should read Sevier rather than Blount County. *See* TRIAL EX. 23, at 30.

land, the desirability of views, availability of utilities, usability of lots, and zoning. Due to these difficulties, it is imperative that appraisers employing the sales comparison approach base their own figures on such comparables. Here, Mr. Fletcher has assigned a value of approximately $12,000.00 per acre to the Franklin Tract, containing approximately 1,445 acres, while his nine comparables have an average acreage of 901.88, were sold for an average sale price of $5,983,626.67, and yielded an average unit price of $6,634.62. As for Mr. White, he assigned a value of $4,050.00 per acre to the Franklin Tract, while the average acreage of his five comparables was 2,873.76, with an average sale price of $7,359,030.00, and an average unit price of $2,560.77.[20] These figures evidence a clear disparity between not only the size of the comparables chosen by each appraiser, with all but two of the properties relied upon by Mr. Fletcher consisting of 500 acres or less, whereas the smallest property relied upon by Mr. White was 1,196.49 acres and two of his comparables measured greater than 4,000 acres, but also confirm the testimony of both that there is an inverse relationship between size and unit price. As such, Mr. White adjusted the unit price for the Franklin Tract upward by 27% from the average of his comparables, presumably to account for the larger acreage average evidenced by his comparable sales. Mr. Fletcher, however, also adjusted his unit price upward by 45% from that of the average of his comparables, even though the assumption would be that the price per unit would decrease rather than increase since the average acreage he relied upon was smaller than that of the Franklin Tract.

This deviation by Mr. Fletcher is not the only cause for concern by the court with his methodology. By his own admission, Mr. Fletcher did not physically visit the Franklin Tract in

---

[20] Subtracting the Three Sisters Mountain property, consisting of approximately 5,000 acres, the average acreage decreases to 380.74 and 2,339.48, respectively.

making his appraisal.  Furthermore, he acknowledged that he arrived at his valuation for the Franklin

Tract by starting with the $27,975,000.00 paid for the Webb Mountain Property by the Plaintiff in

March 2006, then backed out the values he arbitrarily assigned to the other tracts, and testified that

his higher per acre prices of $30,000.00 and $40,000.00 for the Whaley Tract and Executive Realty

Tract, respectively, were not based on any comparable sales or concrete figures but were based solely

on his "judgment" that the entire purchase price had been reasonable and the smaller tracts had been

assigned prices per acre that were, in his opinion, too high.  Additionally, although both appraisers

recognized that a Concept Plan has been approved by the Sevier County Planning Commission for

the entire Webb Mountain Property, only Mr. Fletcher considered this and what he believed were

other entitlements in his analysis, testifying that they added to the value of the Webb Mountain

Property as a whole.  He does not, however, back out those same entitlements and Concept Plan

when valuing the tracts individually, despite his acknowledgment that the true value of the Webb

Mountain Property lies with it remaining whole.

As discussed, when determining valuation, the court is not bound by the opinion of either

appraiser, *In re River Valley Fitness One Ltd. P'ship*, 2006 WL 618442, at *8, 2006 Bankr. LEXIS

345, at *24-25, and the figure at which it arrives need only be within a range of values derived from

consideration of the evidence.  *Whitehouse Hotel L.P.*, 2008 WL 4757336, at *21, 2008 U.S. Tax

Ct. LEXIS 28, at *62.  Because of the wide disparity of the appraisals and the questionable

methodology employed by Mr. Fletcher in arriving at his valuation, the court has taken the analysis

one step further and averaged the appraisers' averages.  Taking the averages referenced above as

determined by both, Mr. Fletcher's average of 901.88 acres and unit price of $6,634.62 and Mr.

37

White's average of 2,873.76 acres and unit price of $2,560.77, the court arrives at an average acreage of 1,887.82 and an average price per acre of $4,597.70. Multiplying this unit price by 1,445.00[21] acres, the court arrives at an overall value of $6,643,676.50 for the Franklin Tract, which it believes better reflects the market value based upon the sales comparison approach and all of the respective properties relied upon by both appraisers considering the size, location, and attributes of the property.[22]

It is undisputed that, as of September 18, 2007, the outstanding debt owed by the Plaintiff to the Defendants on the Franklin Note, secured by the Franklin Tract, was $8,382,328.00, excluding legal fees and post-petition expenses incurred. TRIAL EX. 17. Upon recordation of the Franklin Quit Claim Deed, all outstanding obligations owed by the Plaintiff to the Defendant, Gerald Franklin, Trustee, on the March 24, 2006 non-recourse Promissory Note were extinguished. Because the debt owed on the Franklin Tract was greater than its value, the Plaintiff received reasonably equivalent value for the transfer on September 18, 2007. As such, the transfer effectuated by recordation of the Franklin Quit Claim Deed was not constructively fraudulent under either Tennessee Code Annotated § 66-3-305 or § 66-3-306(a).[23]

---

[21] *See supra*, n.13.

[22] At trial, both appraisers were questioned about a development project in Ellijay, Georgia, which is allegedly similar in size, terrain, and development plans to that of the Webb Mountain Property; however, neither Mr. Fletcher nor Mr. White used this property as a comparable, and the court does not give any weight to the testimony concerning it.

[23] Because the court finds that the Plaintiff received reasonably equivalent value, it is not necessary to examine whether the Plaintiff was engaged in or about to engage in business for which its remaining assets were unreasonably small in relation to the business, or whether the Plaintiff intended to incur or reasonably believed it would incur debts beyond its ability to pay as they became due under Tennessee Code Annotated § 66-3-305(a)(2).

**B**

As an alternative to the valuation assigned by Mr. Fletcher, the Plaintiff urges the court to find the value of the Franklin Tract to be the $9,200,000.00 consideration set forth on the General Warranty Deed in March 2006,[24] arguing that it is, at a minimum, indicative of the value of the property.[25]  There is case law that supports the notion that "the price paid at a commercially reasonable sale is the best evidence of value."  *In re Yellowstone Mt. Club, Inc.*, 410 B.R. 659, 661 (Bankr. D. Mont. 2009); *see also Hitt v. Ng (In re All Am. Bottled Water Corp.)*, 2009 WL 722994, at *8, 2009 Bankr. LEXIS 712, at *21 (Bankr. W.D. Wash. Mar. 17, 2009) (holding that "the best evidence of value is typically the price paid for the property").  However, even if the court were to use this figure, it still finds that the Plaintiff received reasonably equivalent value for the Franklin Tract.

As stated, the outstanding debt owed by the Plaintiff to the Defendants on the Franklin Note secured by the Franklin Tract was $8,382,328.00, which is $817,672.00 less than the $9,200,000.00 purchase price. TRIAL EX. 17.  The Plaintiff argues that this deficit is substantial enough to evidence that it did not receive reasonably equivalent value by the debt's satisfaction in exchange for the Franklin Tract.  Nevertheless, reasonably equivalent value does not require a dollar-for-dollar transaction.  *Butler Aviation Int'l, Inc. v. Whyle (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1125-26 (5th Cir. 1995).  The determination does not turn on whether "the value of what went out,

---

[24] *See supra*, n.3.

[25] The court recognizes that the price per unit of the Franklin Tract, using the $9,200,000.00 valuation, is $6,357.98, which is very close to the average price per acre of Mr. Fletcher's comparable sales referenced above.

i.e., the value of the Property, exceeded the value of what came in, i.e., the total consideration[,]"
as "[t]here is no set minimum percentage or monetary amount necessary to constitute reasonably
equivalent value[.]"  *Lowe v. B.R.B. Enters., Ltd. (In re Calvillo)*, 263 B.R. 214, 220 (W.D. Tex.
2000); *accord Staats v. Butterworth Props., Inc. (In re Humble)*, 19 Fed. Appx. 198, 200, 2001 WL
1006148, at *1, 2001 U.S. App. LEXIS 19093, at *4 (6th Cir. 2001) ("Courts have rejected fixed
mathematical formulae to determine whether an exchange of 'reasonably equivalent values' has
occurred for purposes of section 548 in favor of analysis based upon the facts and circumstances of
each particular case.").  Nevertheless, while there is no minimum percentage or amount required,
"the phrase 'reasonably equivalent value' means 'approximately equivalent' or 'roughly
equivalent.'"  *BFP v. Resolution Trust Corp.*, 114 S. Ct. 1757, 1762 n.4 (1994).

As discussed, the answer to what constitutes "approximately or roughly equivalent" must be
determined on a case by case basis "from all the evidence in a particular case[,]" *Silagy v. Gagon (In
re Gabor)*, 280 B.R. 149, 162 (Bankr. N.D. Ohio 2002), and "fairly concrete" indirect benefits may
also be considered.  *Unencumbered Assets Trust v. Biomar Techs., Inc. (In re Nat'l Century Fin.
Enters., Inc.)*, 341 B.R. 198, 215 (Bankr. S.D. Ohio 2006).  In *Calvillo*, the court considered the
value of an option to repurchase to have economic value and held that, at the time of the transaction,
a comparison of a $1,450,000.00 value in property transferred to the $1,320,000.00 in total
consideration received by the debtor in the form of $400,000.00 cash and the repurchase option was
"clearly reasonably equivalent."  *Calvillo*, 263 B.R. at 220.  Similarly, in what the court called a
"hybrid between a forced sale of debtor's real property and an arm's length sale," the debtor in *Jones*
transferred to the plaintiff real property valued at $63,400.00 for credits totaling $55,175.00 through

40

a deed that, in essence, constituted a deed in lieu of foreclosure. *C&M Invs., LLC v. Jones (In re Jones)*, 209 B.R. 380, 386 (Bankr. E.D. Va. 1997). The court then found that the debtor receiving approximately 87% of the value "in what the court consider[ed] an arm's length transaction, the debtor received a high percentage of his property's value and under less than ideal circumstances where he was confronted with foreclosure and loss of the property" was reasonably equivalent value. *Jones*, 209 B.R. at 386. Additionally, in *All Am. Bottled Water Corp.*, the court found that "when taking into consideration the circumstances surrounding the loan [which was negotiated as one step in a larger business plan], i.e., 100 percent financing, short time-frame, no equity participation and nonrecourse[,]" a transfer of assets in the amount of $25,000,000.00 in satisfaction of a debt in the amount of $32,000,000.00, which constituted 78.125% of the value, was reasonably equivalent. 2009 WL 722994, at *8, 2009 Bankr. LEXIS 712, at *23.

Conversely, in *Carbaat*, the court considered whether a transfer of the debtor's interest in a house and his interest in a note for a total value of $37,900.00 was reasonably equivalent value in exchange for sole ownership of three vehicles and the assumption of a debt for a total value to the debtor of $19,205.00, finding "that the minimum amount of value that would be reasonable [sic] equivalent is $26,530; i.e., 70 percent of the value transferred. The value received that has been discussed thus far falls short of this number by $7,325." *Kendall v. Carbaat (In re Carbaat)*, 357 B.R. 553, 561 (Bankr. N.D. Cal. 2006). Likewise, in *Lindell*, the court considered whether the transfer of notes worth $130,000.00 in exchange for $50,000.00 cash was reasonably equivalent value, holding that it was not reasonably equivalent value to exchange notes for only 38.5% of the value. *Lindquist v. JNG Corp. (In re Lindell)*, 334 B.R. 249, 255-56 (Bankr. D. Minn 2005). A

41

similar determination occurred in *Mid-South Bank & Trust Co. v. Paul Max Quandt Estate*, wherein

the Tennessee Court of Appeals stated that "reasonable minds could only have concluded that the

conveyances [of land worth $280,000.00 in exchange for notes with a face value of $113,450.00,

translating to 40.5% of the value] were made without a fair consideration."  1995 WL 614322, at *7,

1995 Tenn. App. LEXIS 682, at *20 (Tenn. Ct. App. Oct. 20, 1995).

In this case, even though not excepted from application of Tennessee Code Annotated

§§ 66-3-305(a)(2) and 66-3-306 by Tennessee Code Annotated § 66-3-304(b), which applies to

"regularly conducted, noncollusive foreclosure sale[s] or execution of a power of sale," the record

clearly evidences that the Franklin Quit Claim Deed was a deed in lieu of foreclosure, executed in

connection with the Conditional Extension Agreement.  It is also undisputed that the Plaintiff,

through Mr. Collier, voluntarily negotiated and entered into the Conditional Extension Agreement

with the Defendants in order to obtain additional time to bring current the Promissory Notes, which

had been in default from January 2007, and that it voluntarily executed the Quit Claim Deeds,

including the Franklin Quit Claim Deed, as part of this arrangement.[26]

Upon recordation of the Franklin Quit Claim Deed, the Plaintiff unquestionably received

satisfaction of an outstanding debt in the amount of $8,382,328.00 in principal and interest due and

owing on the Franklin Promissory Note on September 18, 2007.  Standing alone, satisfaction of the

$8,382,328.00 debt represents 91.11% of the $9,200,000.00 consideration evidenced on the Warranty

---

[26] *See, e.g., Cate v. Thomas*, 2005 WL 3416316, at *6, 2005 Tenn. App. LEXIS 781, at *16 (Tenn. Ct. App. Dec. 14, 2005) (holding that the defendant, "[h]aving entered into this 1990 conveyance without compulsion, [he] cannot now come before the court to undo what he voluntarily did.").

42

Deed and agreed to as the price paid by the Plaintiff.[27]  This figure does not, however, as testified

to by Mr. Evans, include legal fees, to which the Defendants are entitled under the terms of the

Franklin Note and the Franklin Deed of Trust.[28]  *See* COLL. TRIAL EX. 6 at 2 ("In the event of the

occurrence of any Event of Default this Note is referred to an attorney at law for collection or to

protect the security for its payment, or if suit is brought hereon, the undersigned shall pay the holder

hereof, in any case, all expenses and costs relating thereto, including but not being limited to

reasonable attorneys' fees in the event the Lender prevails in such action.").

Moreover, in the Order entered on March 6, 2008, and corresponding Memorandum on

Motion to Determine That Debtor is Subject to the "Single Asset Real Estate" Provisions of 11

U.S.C. § 362(d)(3), stipulated by the parties as Collective Trial Exhibit 15, the court has previously

held that the entire Webb Mountain Property constitutes single-asset real estate under 11 U.S.C.

§ 362(d)(3) (2006),[29] finding that "based upon the record before the court, it is clear that the tracts

---

[27]  The percentage of the value transferred in the *Calvillo* case referenced above was 91.03%, which is less than the 91.11% between the $9,200,000.00 consideration evidenced on the Warranty Deed to the Franklin Tract and the satisfaction of the non-recourse debt in the amount of $8,382,328.00, which, as previously discussed, includes only principal and interest and not attorney fees.

[28]  The Defendants did not present any proof as to the amount of legal fees incurred thus far, and the court will not speculate as to their amount; however, given the amount of litigation between these parties in this court alone, it can easily be deduced that legal expenses are significant.  The Defendants also ask the court to consider in its calculations the 2007 and 2008 real property taxes paid by Gerald Franklin, Trustee, on the Franklin Tract in the respective amounts of $11,599.00 and $11,947.00, plus $407,905.50 in expenses paid for erosion control, bond expenses, and "Phase I Final Plat & Soft Costs."  However, the court finds that only the 2007 property taxes are an expense potentially compensable under the terms of the Franklin Deed of Trust.  The 2008 property tax liability was incurred after the September 18, 2007 transfer and the other expenses were attributable to services rendered to the Webb Mountain Property as a whole and were incurred primarily in 2008.  They are, therefore, not compensable under the terms of either the Franklin Promissory Note or the Franklin Deed of Trust.

[29]  The Bankruptcy Code defines "single asset real estate" to mean "real property constituting a single property or project, . . . which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental."  11 U.S.C. § 101(51B) (2006).

43

comprise a single project, and even though the Debtor has plans to develop a number of different businesses on the Webb Mountain Property, the plans are still part and parcel of one large land development." *In re Webb Mtn., LLC*, 2008 WL 656271, at *5, 2008 Bankr. LEXIS 691, at *16 (Bankr. E.D. Tenn. Mar. 6, 2008), *aff'd, Webb Mtn, LLC v. Whaley (In re Webb Mtn., LLC)*, 2008 U.S. Dist. LEXIS 75573 (E.D. Tenn. Aug. 26, 2008). As such, the court finds that it is not only impractical to carve out the Franklin Tract but impossible to do so without destroying the integrity of the Webb Mountain Property as a whole.

The undisputed testimony of all parties, including Mr. Collier, the Plaintiff's sole member, establishes that the Plaintiff's purchase of the 1,865 acres comprising the Webb Mountain Property in March 2006, which included the 1,445 acre Franklin Tract, was a means to acquire and subsequently develop the entire acreage.[30] In essence, the Franklin Tract is inseparable from the remaining tracts, a fact that was continually reiterated by the Plaintiff's expert witness. When asked about the highest and best use for the Franklin Tract at trial, Mr. Fletcher repeatedly testified that he believed the highest and best use to be the intended residential/resort-oriented development of the contiguous properties collectively. This opinion is supported in Mr. Fletcher's appraisal report, throughout which he refers to the Concept Plan approved by the Sevier County Regional Planning Commission, as well as the other collective entitlements and permits, all of which apply to and are

---

[30] Mr. Collier testified that the 1,865 acres comprising the Webb Mountain Property was purchased by the Plaintiff as a single tract, but that five deeds were necessary due to the ownership structure of the property. This testimony is reinforced by the October 6, 2006 First Agreement for Purchase and Sale which recites, *inter alia*, that "the Seller is the owner of a vacant parcel of land . . . consisting of approximately 1,865.60 acres on a parcel of land known as Webb Mountain[.]" Additionally, to insure the Plaintiff's acquisition of the entirety of the Webb Mountain Property as a single tract, a sixth "catch-all" General Warranty Deed was executed by the Defendants based upon a survey of the entire property, less the 131-acre M&A Tract. Finally, each of the five Promissory Notes executed in favor of the respective Defendants on March 24, 2006, contained, as an "Event of Default," the Plaintiff's failure to meet its obligations under any of the other Promissory Notes.

inclusive of the entire 1,865 acres comprising the entirety of the Webb Mountain Property, not the individual tracts. Clearly, as Mr. Fletcher testified, these entitlements and permits add value to the "project" as a whole, but their collective nature cannot be ignored. Any division of the "project" into individual properties de-values the entitlements thereon and, in some cases, destroys them.

"Bankruptcy courts are courts of equity. As such, they possess the power to delve behind the form of transactions and relationships to determine the substance." *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 596 (9th Cir. 1991). Based upon the circumstances and facts of this case and the record as a whole, the court also finds that it would be inequitable to carve out the Franklin Tract from the entirety of the Webb Mountain Property, consisting of the four contiguous parcels of property, which further supports the court's determination that the Plaintiff received reasonably equivalent value for the transfer of the Franklin Tract on September 18, 2007.

In summary, the court finds that the Plaintiff received reasonably equivalent value for the transfer of the Franklin Tract by virtue of the recordation of the Franklin Quit Claim Deed on September 18, 2007, and therefore, it is not entitled, under 11 U.S.C. § 544(b), to avoid the transfer as constructively fraudulent under either Tennessee Code Annotated §§ 66-3-305(a)(2) or 66-3-306.

A judgment dismissing the Complaint, as amended, will be entered.[31]


FILED:  November 25, 2009

                                    BY THE COURT

                                    */s/ RICHARD STAIR, JR.*

                                    RICHARD STAIR, JR.
                                    UNITED STATES BANKRUPTCY JUDGE

---

[31] The judgment will also provide that the Abstract of Suit and Notice of Lien *Lis Pendens* recorded by the Plaintiff on June 2, 2008, of record in Book 3101, pg. 748, in the Office of the Register of Deeds for Sevier County, Tennessee, is released.